IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER ALEXANDER | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-cv-2875-L |
| | § | |
| MENTOR MANAGEMENT, INC. d/b/a | § | |
| SEVITA and f/k/a THE MENTOR | § | |
| NETWORK, CAREMERIDIAN, LLC/ | § | |
| d/b/a NEURORESTORATIVE TEXAS | § | |
| | § | |
| Defendants. | § | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Christopher Alexander files this Original Complaint against Defendants Mentor Management, Inc. currently doing business as Sevita, and formerly known as The MENTOR Network, and CareMeridian, LLC d/b/a NeuroRestorative Texas, and in support states as follows:

## NATURE OF SUIT

1. <u>FLSA Claim – Overtime:</u> Plaintiff brings this claim to recover unpaid Overtime compensation from the Defendantss pursuant to the Fair Labor Standards Act ("FLSA") (29 U.S.C.§ 201, *et seq.*). Plaintiff contends that Defendants misclassified Plaintiff as exempt, and failed to compensate Plaintiff for hours worked in excess of 40 hours per week at a rate of one and one- half-times his regular rate of pay.

2. <u>FMLA Claim – Failure to Reinstate:</u> In addition, Plaintiff brings this claim to recover damages arising from Defendants' violation of the Family and Medical Leave Act

("FLMA") (29 U.S.C. § 2601, *et seq.*). Specifically, Defendants failed to restore Plaintiff to his position of Dietary & Food Supervisor after his return from an FMLA-protected leave of absence. Instead, Plaintiff's employment was terminated for pretextual reasons.

## PARTIES

3. Plaintiff Christopher Alexander ("Plaintiff" or "Alexander") is a resident of Garland, Texas, which is located in Dallas County.

4. Defendant Mentor Management, Inc., now doing business as Sevita and formerly known as The MENTOR Network, ("TMN") is a for-profit corporation that jointly operates a facility called "NeuroRestorative Texas" in Dallas County in Garland, Texas.

5. Defendant CareMeridian, LLC d/b/a NeuroRestorative Texas that jointly operates a facility called "NeuroRestorative Texas" in Dallas County in Garland, Texas

6. At all relevant times, TMN was Plaintiff's employer within the meaning of 29 U.S.C. § 2611(4) and 29 U.S.C. § 203(d).

7. At all relevant times, CareMeridian, LLC was Plaintiff's employer within the meaning of 29 U.S.C. § 2611(4) and 29 U.S.C. § 203(d).

8. At all relevant times, TMN and CareMeridian, LLC were joint employers nd both exercised control over the terms and conditions of Plaintiff's employment.

9. At all relevant times, TMN and CareMeridian, LLC were a single enterprise with centralized labor relations, common management, and common ownership or financial control.

10. TMN and CareMeridian, LLC are therefore jointly referred to as "Defendants" in the Complaint and Plaintiff seeks to hold them jointly and severally liable on his FLSA and FMLA claims.

11. At all relevant times, Defendants employed Plaintiff at their Garland, Texas facility.

## JURISDICTION & VENUE

12. Jurisdiction is conferred on this Court by 28 U.S.C. §1331.

13. Venue is proper in this Court under 28 U.S.C. §1441(a). Venue is also proper in this district pursuant to 28 U.S.C. §1391(b)(1) and under 28 U.S.C. §1391(b)(2) because all or substantial part of the events or omission giving rise to the claim occurred at Defendants's Garland, Texas facility which is located in this district.

## FLSA COVERAGE

14. Defendants is a covered enterprise under the FLSA, as Section 3(s)(1)(B) brings within the coverage of the Act employees employed in an enterprise which "is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution."

15. The NeuroRestorative Texas facility where Plaintiff worked was an enterprise primarily engaged in caring for sick and/or mentally ill or defective individuals with brain and/or spinal cord injuries who reside on the premises in its 36-bed main facility and/or 6-bed transitional care facility. See https://www.neurorestorative.com/state-location/dallas-garland/ & https://www.neurorestorative.com/state-location/dallas-garland/.

16. Each of the Defendants is also an enterprise as defined by Section 3(s)(1)(A) of the FLSA.

17. TMN generates more than $500,000 in revenue per year.

18. CareMeridian, LLC generates more than $500,000 in revenue per year.

19. TMN also employs employees who handle and otherwise work with goods or materials that have been moved in interstate commerce, including medical supplies and medications.

20. CareMeridian, LLC also employs employees who handle and otherwise work with goods or materials that have been moved in interstate commerce, including medical supplies and medications.

21. While employed with Defendants, Plaintiff himself also handled and worked with groceries, paper goods, and kitchen and cleaning supplies that he purchased at national chains such as Kroger, Sam's Club, and Restaurant Depot and had moved through interstate commerce.

**FACTS**

22. From approximately November 3, 2019 through June 4, 2021, Mr. Alexander was employed at Defendants' NeuroRestorative Texas facility in Garland, Texas as a Dietary & Food Supervisor.

23. Mr. Alexander was misclassified as "exempt" from the FLSA's overtime requirements.

24. Although he was labeled a "supervisor," Mr. Alexander's primary job duties consisted of low-level manual labor.

25. Mr. Alexander was responsible for performing the non-exempt job duties of a Dietary and Food Aide and Dietary and Food Cook.

26. Mr. Alexander spent the vast majority of his time preparing and cooking enough food to feed residents three meals per day (at one point for seven days per week), washing the

dishes after meals, cleaning the kitchen, going to stores to purchase groceries and kitchen and cleaning supplies, and helping to deliver and pick up meal trays from residents.

27. In fact, even though the Garland facility was supposed to be staffed with a Dietary and Food Supervisor, a Dietary and Food Aide, and a Dietary and Food Cook in the kitchen area, Mr. Alexander was the only employee who worked in the kitchen area from March 2, 2021 through to the date of his termination.

28. As a result, from March 2, 2021 through to the date of his termination, Mr. Alexander was not supervising any employees at all.

29. Before that, only one part-time employee was available to help Mr. Alexander in the kitchen from October 2, 2020 through March 1, 2021.

30. As a result, from October 2, 2020 through March 1, 2021, Mr. Alexander's job duties only included the responsibility of supervising one part-time employee.

31. Mr. Alexander regularly worked in excess of 40 hours a week.

32. Between October 4, 2021 and April 30, 2021 Mr. Alexander worked an average of 52.7 hours per week.

33. The week of February 28, 2021 when the part-time dietary aide quit, Mr. Alexander worked seven days straight from February 28, 2021 through March 6, 2021 from 7:00am in the morning through 5:30pm in the evening each day.

34. The week before that Mr. Alexander had worked 10.5 hours per day for six days straight from February 22, 2021 through February 27, 2021.

35. The week after that Mr. Alexander worked six straight days from March 7, 2021 through March 13, 2021, working five 10.5 hour days and one 11.5 hour day before finally on March 14th getting his first day off since February 21st.

36. Despite the long hours Mr. Alexander worked, Defendants did not compensate Mr. Alexander at the rate of one and one-half times his regular rate of pay for the hours Mr. Alexander worked in excess of forty hours per week.

37. Instead, every single week, Mr. Alexander was paid the same salary regardless of how many hours he worked.

38. The amount of work hours Mr. Alexander put in at the facility, including the 19 days straight he worked without a day off in late February/early March 2021, began to take a toll on Mr. Alexander's health.

39. On Friday, April 30, 2021, Alexander informed the newly hired Program Director that he needed to leave work early because he was physically ill due to hypertension and stress.

40. The following Monday, Mr. Alexander informed the Program Director that his doctor had removed him from work until May 17, 2021, and obtained the paperwork necessary to apply for an approved FMLA leave of absence.

41. On May 2, 2021, Mr. Alexander filed an Ethics Complaint telling the company that he had been performing the job of aide, cook, and dishwasher for the past 18 months, and that instead of receiving gratitude for picking up these extra job duties, the Program Director had come in and started to criticize Mr. Alexander for minor issues like cake crumbs left by another employee on a table.

42. On May 3, 2021, Mr. Alexander began an approved FMLA leave of absence from work.

43. On May 4, 2021, while Mr. Alexander was on his approved FMLA leave of absence, the facility posted a job advertisement for Mr. Alexander's job (as well as advertisements for a Dietary and Food Aide and Dietary and Food Cook).

44. On May 13, 2021, Mr. Alexander informed the company that his doctor had extended his leave through May 31, 2021.

45. Sedgwick, Defendants' FMLA and STD administrator, approved Mr. Alexander's FMLA leave through May 31, 2021.

46. On approximately Friday, May 28, 2021, however, Mr. Alexander was informed that he would not be permitted to return to work despite the fact that "his leave of absence" had "made him eligible to return to work on Monday, May 31."

47. In this May 28, 2021, the Program Director purported that she had made several "concerning discoveries" while Mr. Alexander was out on leave.

48. On information and belief, Defendants had already hired Mr. Alexander's replacement before sending Mr. Alexander the May 28, 2021 e-mail and while Mr. Alexander was still out on approved FMLA leave.

49. On Tuesday, June 1, 2021, the Program Director and Executive Director called Mr. Alexander and informed him of each purported "concerning discovery."

50. They stated that they had found a liquor bottle in the kitchen, and alleged that certain foods were not labeled properly.

51. Mr. Alexander explained that the liquor bottle had been in the kitchen for a very long time, as the prior Program Director had purchased it for a holiday party and left it along with extra bottles of champagne in the facility's kitchen.

52. Mr. Alexander further explained that he had done the best he could to keep up with the food labeling while working long hours with no help to keep the residents fed and the kitchen clean.

53. Two days later, on June 4, 2021, the Program Director and Executive Director

called Mr. Alexander again.

54. This time, the Executive Director informed Mr. Alexander he was terminated.

55. The Executive Director told Mr. Alexander that he was being terminated because he had received several disciplinary actions, and because he had not made adequate progress from Thursday, April 22, 2021 to Friday, April 29, 2021, (the day Mr. Alexander left early for his serious health condition) on items discussed at a meeting on Thursday, April 22, 2021.

56. Mr. Alexander had not been given any type of document outlining the matters discussed at the Thursday, April 22, 2021 meeting, or providing further instructions as to what tasks he was being required to undertake until Friday, April 29, 2021.

57. The reasons for Mr. Alexander's termination were entirely pretextual, and the real reason the company fired Mr. Alexander was because he exercised his right to go out on an FMLA leave of absence.

58. Indeed, prior to his FMLA leave, Mr. Alexander had only been made aware of one prior discipline that had been issued to him, which was for not completing an online training on time. Mr. Alexander had remedied this deficiency long ago, in a timely fashion, by completing the online training.

## COUNT 1:

*Violation of the FLSA's Overtime Requirements*

59. During all relevant times herein, Plaintiff was an employee and Defendants was an employer as defined by the FLSA. 29 U.S.C. § 203(d), 29 U.S.C. § 203(e).

60. By the acts and omissions set forth herein, Defendants violated Plaintiff's rights under the FLSA. Specifically, it misclassified him as exempt, and as a result, it failed to pay him any overtime wages for the weeks in which he worked over 40 hours.

61. Defendants' violation of the FLSA in this regard was willful. It either knew that Plaintiff was misclassified, *or* it has shown reckless disregard for whether Plaintiff was properly classified (by failing to inquire into the situation or consult with an attorney or other consultant on the issue).

62. Plaintiff seeks to recover an amount equal to the overtime payments lawfully owed to him for the weeks in which he worked over 40 hours, together with an equal amount as liquidated damages. Plaintiff further seeks to recover his attorney's fees, costs, and pre- and post-judgment interest at the highest rate allowed by law.

## COUNT 2:

*Failure to Reinstate & Wrongful Termination Under the FMLA*

63. Plaintiff re-alleges and incorporates by reference all of the facts set forth in the above sections of this Complaint.

64. During all relevant times, TMN was an "employer" as defined by the FMLA. 29 U.S.C. § 2611(4).

65. During all relevant times, CareMeridian, LLC was an "employer" as defined by the FMLA 29 U.S.C. § 2611(4).

66. During all relevant times, TMN and CareMeridian, LLC were joint employers and/or a single employer as defined by the FMLA.

67. During all relevant times, Plaintiff was an "eligible employee" as defined by the FMLA.  29 U.S.C. § 2611(2)(A), 29 C.F.R. § 825.110.

68. Plaintiff had worked for Defendants for more than one year at the time his approved FMLA leave of absence began on May 3, 2021.

69. Plaintiff had worked more than 1,250 hours from Defendants in the year before

his approved FMLA leave of absence began on May 3, 2021.

70. Plaintiff's hypertension and ongoing medical treatment was a serious health condition under the FMLA. 29 U.S.C. § 2611(a)(1)(D), 29 C.F.R. § 825.113, 29 C.F.R. § 825.114, and 29 C.F.R. § 825.115.

71. Plaintiff informed Defendants that he needed to take leave, and that he needed to do so for an FMLA-qualifying reason. 29 C.F.R. § 825.301(b).

72. Defendants' third-party administrator found Plaintiff eligible for an approved FMLA leave of absence from May 3, 2021 through May 31, 2021 based on the medical certification Plaintiff's doctor provided to the company.

73. When Plaintiff's approved FMLA leave of absence ended, Defendants failed to return Plaintiff "to the same position [he] held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment," as required by 29 CFR 825.214.

74. Plaintiff's decision to exercise his right to take approved FMLA leave was a motivating factor in Defendants' decision to post Plaintiff's job, hire Plaintiff's replacement, and fire Plaintiff.

75. Defendants would not have fired Plaintiff when it did had Plaintiff not applied for and taken an FMLA leave of absence.

76. As a result of Defendants' violation of the FMLA, Plaintiff requests that he be awarded all damages to which he is entitled, as outlined in 29 U.S.C. § 2617, including but not limited to, lost wages and employee benefits, liquidated damages, pre-judgment interest, post-judgment interest, and reasonable attorney fees and costs.

## JURY DEMAND

77.     Plaintiff requests a trial by jury on all of his claims, including his FMLA and FLSA claims.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a.      For an Order pursuant to Section 16(b) of the FLSA finding Defendants liable for unpaid back overtime wages due to Plaintiff, and for liquidated damages equal in amount to the unpaid compensation found due to Plaintiff;

b.      For an Order finding Defendants liable for Plaintiff's actual damages, including lost wages and benefits (both back pay and front pay), the sum to be determined at time of trial as a result of Defendants' FMLA violations;

c.      For an Order finding Defendants liable for liquidated damages in an amount equal to Plaintiff's lost wages, plus interest as a result of Defendants' FMLA violations;

f.      An order that Defendants take such other and further actions as may be necessary to redress Defendants' violations of the FMLA, including, if applicable, reinstatement to Plaintiff's former position (or front pay if reinstatement not feasible);

g.      For an Order awarding Plaintiff the costs of this action;

h.      For an Order awarding Plaintiff reasonable attorney's fees;

i.      For and Order awarding Plaintiff pre-judgment and post-judgment interest at the highest rates allowed by law;

j.      For an Order finding Defendants jointly and severally liable for all damages, costs, fees, interest, and other relief awarded to Plaintiff; and

k.      For an Order granting such other and further relief as may be necessary and appropriate.

| | |
|---|---|
| Date: December 31, 2021 | Respectfully submitted,<br><br>**TREMAIN ARTAZA PLLC**<br><br>*/s/ Christine A. Hopkins*<br>Christine A. Hopkins<br>Texas State Bar No. 24095768<br>christine@tremainartaza.com<br>Carmen Artaza<br>Texas State Bar No. 24055114<br>carmen@tremainartaza.com<br>13140 Coit Rd., Ste 103<br>Dallas, TX 75240<br>Direct: (469) 573-0297<br>Fax: (214) 254-4941<br><br>**COUNSEL FOR PLAINTIFF** |

## CERTIFICATE OF SERVICE

I hereby certify that, on December 31, 2021 I electronically submitted the foregoing document to the Clerk of the Court using the ECF system, which will transmit a Notice of Electronic Filing to all counsel of record.

*/s/ Christine A. Hopkins*